Harry L. and Mary Kremer v. Commissioner.
Kremer v. Commissioner
Docket No. 47078.
United States Tax Court
T.C. Memo 1957-69; 1957 Tax Ct. Memo LEXIS 183; 16 T.C.M. (CCH) 297; T.C.M. (RIA) 57069; April 30, 1957
*183 Held: on the facts, respondent's determination of deficiencies in petitioners' income tax computed on the basis of net worth increase plus expenditures is sustained. Held further: at least part of the deficiency for each of the taxable years 1943 to 1951, inclusive, was due to fraud and the return filed for each year was false and fraudulent with intent to evade tax. Elmer J. Ryan, Esq., 89 Virginia, St. Paul, Minn., for the petitioners. Thomas A. Steele, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent *184 determined deficiencies in the income and victory tax for 1943 and income tax for the years 1944 to 1951, inclusive, of petitioners and additions to tax as follows: Additions to Tax
Sec. 294
Year
Deficiency
Sec. 293(b)
(d)(2)
1943
$1,880.33
$ 940.22
$110.66
1944
4,562.29
2,307.02
274.31
1945
7,845.61
3,922.81
472.66
1946
$7,617.71
$3,808.86
$458.78
1947
2,606.72
1,303.36
147.43
1948
1,626.10
831.83
90.91
1949
1,850.34
925.13
89.85
1950
1,150.08
575.04
62.08
1951
5,466.68
2,733.34
329.04 By amendments to his answer respondent claims increased deficiencies in income tax for the years 1946 to 1949, inclusive, as follows: Deficiencies
Year
as Increased
1946
$8,218.10
1947
3,056.07
1948
2,075.18
1949
1,941.86 Respondent also claims in his amended answer increased additions to tax for the years 1946 to 1949, inclusive, in accordance with the increased deficiencies. Respondent has made a jeopardy assessment of the deficiencies and additions to tax pursuant to section 273, Internal Revenue Code of 1939. The issues for decision are these: (1) Whether respondent correctly determined *185 deficiencies against petitioners for each of the years 1943 to 1951, inclusive; (2) Whether petitioners are liable for 50 per cent additions to tax for the years 1943 to 1951, inclusive, under section 293(b) of the Internal Revenue Code of 1939; (3) Whether petitioners are liable for additions to tax for substantial underestimation of estimated tax for the years 1943 to 1951, inclusive, under section 294(d)(2); (4) Whether the determination of deficiency for any of the taxable years is barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and are so found. For each of the calendar years 1943 to 1951, inclusive, Harry L. and Mary Kremer, residents of St. Paul, Minnesota, filed joint income tax returns with the collector of internal revenue for the district of Minnesota. Harry L. Kremer (hereinafter referred to as Harry) left home at the age of 18 and joined the Navy. During his period of service an allotment of $45 per month was deducted from his pay and sent to his parents. Upon his discharge from the Navy after 32 months service Harry went to work for the St. Paul Hydraulic Hoist Co. for approximately one year where he received *186 a salary of 70 cents an hour for a five and one-half-day week. Beginning in September of 1922, he was employed by the St. Paul Dispatch-Pioneer newspaper at a salary of $35 per week. When he quit the newspaper in the fall of 1925 he was receiving a salary of $45 per week. In 1927 Harry opened a beer and liquor speakeasy in St. Paul. When this business was "knocked off" in 1928 Harry formed a partnership to operate a similar establishment with Matt Luby. Harry and Luby agreed to split the profits evenly and Luby's income from the business was approximately $75 to $95 per week. This business was closed down in 1931 as a result of a murder trial in which Harry was involved. In 1931 Harry testified as a witness for the state in a murder prosecution. Thereafter, in 1933 and again in 1937, Harry signed affidavits in which he stated that he had perjured himself at the trial and that a considerable portion of his testimony had been false. Harry's affidavits were submitted in an attempt to obtain a new trial for the defendant who was convicted of murder. Harry married his first wife, Esther, in 1922. He supported her for approximately two years and furnished a home for her until they *187 were divorced in 1925. In 1926 or 1927 he began living with his second wife, Ruby, who subsequently gave birth to a daughter, Carol. Harry supported both Ruby and Carol until his divorce from Ruby in 1934. After the divorce Harry gave Ruby $2,500 worth of furniture. On January 27, 1934, Harry submitted an affidavit to a Minnesota District Court in which he stated that he could not meet support payments of $60 a month to Ruby and Carol because the income from the operation of his business did not exceed $100 per month. As a result of this divorce Carol was placed in a foster home where she was supported by Harry until she came to live with Harry and his present family. In 1934 Harry married his present wife, Mary, who had worked as a waitress from the time she was 14 years old until she married Harry at the age of 26. Mary came from a large family of seven children and she had contributed to the support of her family until she was 18. Harry has three children by his wife Mary, all of whom were born between 1934 and 1938. During the taxable years Harry supported Mary and her three children and Carol. From 1934 through 1938 Harry also supported Mary's sister who lived with them during *188 that time. Petitioners lived in apartments until 1935, when they purchased their first home in St. Paul. Thereafter petitioners bought progressively more expensive residences. They financed the purchase of their new homes by selling the old home and by placing a substantial mortgage on the new one. In 1938 petitioners purchased an additional piece of property which they did not use as a residence. In June of 1943 petitioners mortgaged this property for $1,800. In the same month petitioners purchased a lake cottage for $1,800. At the time of this purchase petitioners were living in a home costing $7,500 upon which they had previously placed a mortgage of $6,480. During the years 1929 to 1941, inclusive, petitioner purchased automobiles, radios, home appliances, furniture, business equipment, and other merchandise by means of conditional sales contracts and chattel mortgages. No conditional sales contracts or chattel mortgages involving purchases by petitioners were recorded in any years subsequent to 1941. From 1934 until March of 1940 Harry maintained a savings account with the Commercial State Bank in St. Paul. The balances in the account ranged from a low of $58.28 in January *189 of 1934 to a high of $2,971.75 in March of 1937. The account was closed in February of 1940 by a withdrawal of the remaining balance of $104.45. For the years 1933 to 1937, inclusive, the State of Minnesota recovered judgments against Harry for nonpayment of personal property taxes. For the years 1940, 1941, and 1942 the Money and Credits Tax Lists on file in Ramsey County, Minnesota, valued Harry's money and credits in the amounts of $2,000, $500, and $350. No assessment for money and credits tax was made against Mary Kremer for those years. Petitioners paid no income tax in any year prior to 1939. For the taxable year 1939 they paid income tax of $187.66. For the taxable years 1940, 1941, and 1942 Mary Kremer did not file Federal income tax returns. For the taxable year 1940 Harry filed a return showing no tax due. For the taxable year 1941 Harry paid income tax of $10.27, and for the taxable year 1942 he paid income tax of $42.03. From 1934 until 1939 Harry and Mary operated a tavern known as Kremer's Buffet. They operated on a cash basis and borrowed money from a brewery to cash checks for their customers. Although no records are available for prior years, for the period *190 January 1, 1939 to June 1, 1939, the tavern showed a net profit of $746. After selling the tavern in 1939 Harry bought an interest in the Carolina Nut Corporation, but sold the interest in 1940 because he had no additional money to invest in the business. On his income tax return for 1940 Harry reported a net profit of $125 from the sale of his interest in the nut business. In 1940 Harry purchased his father's spring business for $5,000 which he paid off at the rate of $70 per month for four or five months and subsequently at the rate of $140 per month. When Harry's father died in 1941 Harry still owed $1,640 on this debt. In 1942 Harry bought an interest in Northwest B-Line, Inc., a spring alignment business. For the period November 1, 1942 to October 31, 1943 this company reported net income of $456.25. During the taxable years in question Harry was in the automobile spring and alignment business. No formal books and records of the business were kept for any year prior to 1947, and no sales invoices were available for any year prior to 1951. The records for the years 1947 to 1951, inclusive, consisted only of miscellaneous invoices, correspondence, paid bills, a ledger which *191 did not reflect sales, and sales journals. Petitioners did not maintain records which clearly reflected their income from the spring and alignment business for the taxable years in question. Harry maintained two sets of sales journals for both the spring department and the frame department of his business. The amounts recorded as cash sales in one set of journals are approximately double the amounts recorded in the second set of journals for the same period. The journals containing the larger amounts of cash sales reflect cash sales broken into separate items most of which are identified by invoice number, whereas the journals reflecting the smaller amounts show cash sales in a lump sum without itemization or identification. Harry's sister kept the double sets of journals from 1947 until 1951. However, the only journals produced by petitioners were the spring department journal which contains the larger amounts of cash sales and covers the period from March 15, 1948 to August 15, 1949, inclusive; the frame department journal containing the larger amounts of cash sales and covering the period August 18, 1947 to July 15, 1949, inclusive; the spring department journal containing the *192 smaller amounts of cash sales and covering the period from May 10, 1948 to December 14, 1949, inclusive; and the frame department journal reflecting the smaller amounts of cash sales covering the period January 2, 1946 to December 31, 1947, inclusive. No other journals were made available to respondent's investigators, and Harry denied that any other journals existed. Petitioners' income tax returns were made up from the journals reflecting the smaller amounts of cash sales. During the period from 1947 to 1951 when his sister kept the books, Harry took the cash receipts from the spring and alignment business home every night instead of depositing them in a business bank account. No records of the amounts of cash withdrawn were kept. Harry continued this practice after two accountants advised him to deposit cash. Harry's sister was permitted to make only deposits of checks in his &ccount with the American National Bank, and she was never permitted to make deposits of any sort to his Produce Exchange Bank account. If any deposits were made in this latter account, they were made by Harry, and frequently in cash. During the year 1947 Harry made cash deposits to the amount of $10,500 *193 to the Produce Exchange Bank account. None of this amount was reported for income tax purposes. For the years 1947 to 1951, inclusive, petitioners' available records contain an item known as a cash overage account. This account reflects cash received through the operation of the business and which is not reflected in the sales journal. Because of Harry's practice of taking cash receipts home and not returning them to his bookkeeper, the cash overage account was frequently adjusted. In 1951 Harry took home at least $3,000 from the cash overage account and did not report it as income. Because of activity of the cash overage account, receipts from petitioners' business were not properly recorded in the sales journal. In 1947 Harry negotiated a loan with the Stockyards National Bank to expand his growing business. The business was receiving large accounts from trucking firms in St. Paul through Harry's former partner in the Northwest B-Line, Inc. During the years 1947 to 1951, inclusive, however, Harry's spring and alignment business showed a very low net profit. Over this five-year period Harry's closest business competitor showed a percentage of net profit to total receipts which *194 was more than three times greater than the percentage of net profit shown by Harry's business. Both spring and alignment businesses do similar work and both have approximately the same number of employees. During the taxable years in question petitioners increased their standard of living and made large and extended expenditures. Beginning in 1943, Mary drove her own automobile and by 1951 the Kremers owned two Cadillacs and a Studebaker. In 1945 petitioners moved into a new home which cost $22,500 and was located on a three-acre estate with swimming pool. Petitioners made extensive improvements to this residence during the years involved. During the same period two of petitioners' daughters attended private schools and Harry continued to support his daughter by his second wife. Harry also was paying $1,800 a year for an annuity policy, buying sporting equipment, acquiring dogs and going on hunting trips. Most of these expenditures were not reflected in bank accounts. Petitioners' net worth increased substantially between December 31, 1942 and December 31, 1951. Most of the items making up respondent's net worth schedule have been stipulated and are incorporated herein. In addition *195 to the stipulated items petitioner's net worth for the taxable period includes the following: ASSETS
ITEM
12/31/42
12/31/43
12/31/44
12/31/45
12/31/46
1. Cash on hand
$1,000.00
10. Northwest B-Line,
Inc.
200.00
12(a). Old Building
$ 451.23
23. Equipment
$ 100.26
$ 100.26
$ 100.26
100.26
24. Equipment
3,000.00
3,000.00
3,000.00
24(a). Equipment
228.33
26. Blast Furnace In-
stallation
124.65
35. 1936 Plymouth (Per-
sonal)
400.00
48. 1209 Watson Im-
provements
400.00
50. 212 E. Thompson
Improvements
1,671.28
54. Additional Home
Furnishings
1,015.00
LIABILITIES
e. Henry Kremer or his
Estate
$1,640.00
f. Mrs. Henry Kremer
$ 500.00
Additional Reserves for
Depreciation
n. Equipment
16.71
$ 33.42
$ 50.13
$ 66.84
o. Equipment
500.00
1,000.00
1,500.00
p. Equipment
20.77
q. Equipment
38.05
r. Old Building
18.05
s. Trucks
451.25
846.25
1,025.00
1,187.50
1,350.00
Add: Personal Living Ex-
penses
$3,500.00
$4,000.00
$4,500.00
$5,000.00
Less: 1209 Watson
2,800.00
ASSETS
ITEM
12/31//47
12/31/48
12/31/49
12/31/50
12/31/51
1. Cash on hand
$10,000.00
10. Northwest B-Line,
Inc.
12(a). Old Building
$ 451.23
$ 451.23
$ 451.23
$ 451.23
451.23
23. Equipment
100.26
100.26
100.26
100.26
100.26
24. Equipment
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
24(a). Equipment
228.33
228.33
228.33
228.33
228.33
26. Blast Furnace In-
stallation
124.65
124.65
124.65
124.65
124.65
35. 1936 Plymouth (Per-
sonal)
400.00
48. 1209 Watson Im-
provements
50. 212 E. Thompson
Improvements
2,171.54
2,372.19
2,372.19
3,044.58
3,296.69
54. Additional Home
Furnishings
2,115.00
4,055.00
4,455.00
4,455.00
4,455.00
LIABILITIES
e. Henry Kremer or his
Estate
f. Mrs. Henry Kremer
Additional Reserves for
Depreciation
n. Equipment
$ 83.55
$ 100.26
$ 100.26
$ 100.26
$ 100.26
o. Equipment
2,000.00
2,500.00
3,000.00
3,000.00
3,000.00
p. Equipment
41.54
62.31
83.08
103.85
124.65
q. Equipment
76.10
114.15
152.20
190.25
228.33
r. Old Building
36.10
54.15
72.20
90.25
108.30
s. Trucks
Add: Personal Living Ex-
penses
$5,536.65
$6,808.68
$6,890.41
$6,371.75
$ 6,565.10
Less: 1209 Watson
*196 Petitioners' corrected net income, reported net income, and unreported income during the taxable years were as follows: Net In-
Addi-
Corrected
come Per
tional
Net Income
Return
Net Income
12/31/42
12/31/43
$ 7,880.39
$3,503.72
$ 4,376.67
12/31/44
16,485.97
3,664.41
12,821.56
12/31/45
21,088.93
4,553.70
16,535.23
12/31/46
27,749.77
4,730.02
23,019.75
12/31/47
12,716.81
6,393.68
6,323.13
12/31/48
16,369.86
6,319.63
10,050.23
12/31/49
13,311.26
4,489.58
8,821.68
12/31/50
10,230.16
5,235.59
4,994.57
12/31/51
23,940.64
5,645.81
18,294.83
In 1951, on the recommendation of Charles Youness, Harry hired Stanley Moldenhauer to keep his books. When Moldenhauer subsequently threatened to call in Federal investigators, Harry fired him. On the same day he was fired, Moldenhauer received a "going over" by Youness. As a result of the fracas between Moldenhauer and Youness, petitioners' income tax liability came under investigation. In December of 1954 Harry pleaded guilty to and was convicted of attempting to evade income tax for 1947, and was sentenced to pay a fine of $3,000. The income for each of the taxable years *197 was understated, a part of the deficiency for each year was due to fraud, and the return filed for each year was false and fraudulent with intent to evade tax. Petitioners substantially underestimated their estimated tax for each of the taxable years involved. Opinion Respondent determined deficiencies in the income tax of petitioners by computing their net income on the basis of net worth increase plus expenditures. Petitioners do not contest the use of the net worth method but do attack the accuracy of respondent's computation. Most of the items contained in respondent's net worth schedule have been stipulated and have been incorporated in our findings. As for those items not agreed to, we have made findings in accordance with the testimony and evidence presented at the hearing and after an exhaustive examination of the record. Consequently, discussion is limited to some of the more important of the contested items. Beginning Cash Petitioners testified that prior to the beginning of the net worth period they had accumulated some $45,000 to $50,000 which they had kept concealed in a metal box at their home. Mary further testified that she had saved approximately $6,000 *198 before her marriage to Harry and that he had accumulated $15,000 or $20,000 by 1934. Nothing in the record supports petitioners' contention except their uncorroborated, selfserving statements and the prejudiced testimony of Mary's sister who lived with the Kremers from 1934 to 1938. No evidence has been produced by petitioners to show the receipt of substantial gifts or inheritances by either of them prior to 1943, nor have they given any explanation as to how they accumulated large amounts of cash during the depression years. Furthermore, Harry Kremer is an admitted perjurer. Under the circumstances, no weight is attached to petitioners' uncorroborated testimony. Not only is there a lack of corroboration of petitioners' claim of a substantial cash hoard, but there is also a series of events which directly contradict petitioners' testimony. Harry's employment record from the time he left home and joined the Navy at the age of 18 until his marriage to Mary in 1934 reveals no period of employment during which he received large amounts of wages or receipts. Furthermore, during the earlier years, Harry contributed support to his parents, to his first wife until their divorce, and to *199 his second wife and her child, Carol. Harry's second wife also received $2,500 worth of furniture from him after their divorce in 1934. Nor was Mary's earning record particularly successful prior to her marriage to Harry. She worked as a waitress from the age of 14 until she married Harry in 1934, and during this time she furnished some support for her family. All of these facts negate the existence of any substantial cash accumulation by either Harry or Mary at the time of their marriage. Events which occurred between 1934 and 1943 render petitioners' testimony even more incredible. Petitioners operated a tavern at such a small margin of profit that they were forced to borrow substantial sums regularly from a brewery in order to cash checks for customers. To finance the purchase of real estate, petitioners incurred substantial mortgages and seldom paid cash. Petitioners acquired their personal property such as automobiles, furniture, and home appliances by means of conditional sales contracts and chattel mortgages. In addition, Harry's business transactions during this period were financed by mortgaging real estate or by withdrawing funds from a savings account which he maintained *200 from 1934 until 1940. To purchase his father's business in 1940, Harry agreed to pay the purchase price in monthly installments. In the same year Harry was also forced to sell his interest in an expanding nut corporation because he had no available funds to invest. Furthermore, petitioners paid no Federal income taxes prior to 1939 and paid only small amounts for the years 1939 to 1942, inclusive. The State of Minnesota obtained judgments against Harry for personal property taxes for the years 1933 to 1937, and the St. Paul Money and Credits Tax Lists valued Harry's money and credits at $350 in 1942. Finally, three children were born to Mary and Harry between the years 1934 and 1938. Harry supported all of them in addition to his first daughter, Carol, and Mary's sister who lived with them from 1934 to 1938. Since these facts effectively refute petitioners' self-serving statements and the obviously biased testimony of Mary's sister, petitioners' claim of beginning cash of $45,000 to $50,000 in 1943 is rejected. However, on the basis of the evidence presented, we have found that by 1943 petitioners had accumulated $1,000 which is otherwise unaccounted for, and this amount has been *201 allotted to the cash on hand item of the net worth computation. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540. Ending Cash Petitioners contend that they had no cash on hand at the end of the net worth period on December 31, 1951. This contention is directly contrary to the testimony of respondent's agent that Harry admitted having $3,000 cash from the business and $7,000 in his "reserve" in 1951. Harry's testimony from the witness stand as to this item, although evasive, tends to substantiate the testimony of respondent's agent. Moreover, during the taxable years Harry and his family enjoyed a high standard of living, his business prospered, and he admittedly took home substantial amounts of cash from the business every week. These facts buttress respondent's determination that petitioners had cash on hand of $10,000 on December 31, 1951, and this amount has been allowed in the findings. Living Expenses The amounts attributable to petitioners for living expenses during the taxable years in issue have been set out in the findings. For the years 1947 to 1951, inclusive, respondent was able to determine petitioners' personal and family expenses on the basis of petitioners' *202 own records and admissions, whereas the lower living expense estimates submitted by petitioners for those years are unsubstantiated. Our findings, therefore, adopt the amounts of living expenses determined by respondent for 1947 to 1951, inclusive. For the years 1943 to 1946, inclusive, however, there is evidence that petitioners maintained a standard of living that justified, at least in part, the lower estimate submitted by them. We have, therefore, concluded that respondent's figures for those years should be reduced by the amount of $500 per year and findings have been entered to this effect. Fraud We have found that at least part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. Our finding in this regard is supported by clear and convincing evidence. Petitioners did not maintain complete business records correctly reflecting their income during the taxable period. Instead, they kept two sets of sales journals for each of the departments of their business, one set containing double the amount of sales reflected in the other. The amounts of sales reported by petitioners on their income tax returns were based on the sales contained *203 in the journals reflecting the smaller amounts, and the net profit of petitioners' business as reflected in its meager records was unbelievably low in comparison with the net profit of a competing business of approximately the same size. Petitioners' explanation that they kept a double set of sales journals in order to inspire their employees toward increased production is too incredible to warrant comment. In addition, cash receipts in substantial amounts were taken out of the business and not properly reflected in any records. The only records produced were fragmentary and covered only small portions of the taxable period. In each of the taxable years in question there is a substantial difference between the amounts of income reported by petitioners and the correct net income, and in most of the taxable years the correct net income is double the amount of income reported on petitioners' returns. Furthermore, petitioners increased their standard of living considerably during the taxable period; they made large personal expenditures most of which were not accounted for in bank accounts; and on at least two occasions they failed to report large amounts of income that were specifically *204 traceable to them. Finally, for the taxable year 1947, Harry was criminally convicted of tax evasion upon his plea of guilty. These facts, together with many others not discussed here, establish by clear and convincing evidence that the deficiencies for all of the taxable years involved were due, at least in part, to fraud and that the return filed for each year was false and fraudulent with intent to evade tax. It therefore follows that the statute of limitations has not run on any of the years involved (section 276(a), Internal Revenue Code of 1939), and that respondent correctly determined that petitioners are liable for 50 per cent additions to tax. (Section 293(b), Internal Revenue Code of 1939.) Substantial Underestimate of Estimated Tax Respondent has determined that petitioners are liable under section 294(d)(2) for 6 per cent additions to tax for substantial underestimation of estimated tax for each of the taxable years involved. Petitioners, on brief, have not contested respondent's determination with respect to this issue, and that determination is accordingly sustained. Decision will be entered under Rule 50.